IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: CAROLYN SUZANNE STEPHENS, Debtor | No. 5:13-bk-72513 |
| | Ch. 7 |
| CAROLYN SUZANNE STEPHENS | PLAINTIFF |
| v. | 5:13-ap-7063 |
| INTERNAL REVENUE SERVICE | DEFENDANT |

**ORDER AND OPINION FINDING TAX DEBT NONDISCHARGEABLE**

Carolyn Suzanne Stephens [the debtor], filed her chapter 7 bankruptcy petition on July 18, 2013. On August 7, 2013, the debtor filed this adversary proceeding against the Internal Revenue Service [IRS] seeking a determination that her tax liability for the years 2004, 2005, 2006, and 2007 is dischargeable under 11 U.S.C. §§ 523(a)(1) and 727(b). The IRS filed an answer to the complaint on September 30, 2013. The Court held a two-day trial beginning on October 26, 2015. Jill R. Jacoway appeared on behalf of the debtor. Curtis J. Weidler appeared on behalf of the IRS. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court finds that the debtor willfully attempted to evade or defeat paying the full amount of her taxes due for the years 2004, 2005, 2006, and 2007 [the taxes]. Accordingly, the Court denies the debtor's complaint and finds that the debtor's tax liability for the years 2004, 2005, 2006, and 2007 is nondischargeable pursuant to § 523(a)(1)(C).

**Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure

7052.

**Background**

The debtor testified that she holds a bachelor's degree in French, English, Speech, and Drama and a master's degree in Theater History from the University of Arkansas, as well as a teaching certificate from the University of Tulsa. While working toward her master's degree, the debtor took a commercial real estate course and later worked as a real estate agent for a few years. She was accepted into the doctoral program in education at the University of Arkansas but discontinued the program nine hours short of obtaining her PhD. In 1985, she became a certified executive chef, training at the Cordon Bleu in Paris. After receiving her culinary training, the debtor ran a catering business, a cooking school, a restaurant, and a gourmet food store. In 2003, she developed a frozen appetizer that she sold to a third party for distribution nationwide in Sam's Clubs. Since the time she was young, the debtor was also a shareholder in three helicopter corporations [the helicopter companies] that her father founded. She gained control of the helicopter companies in 2001 and inherited the companies upon her father's death in 2005. The tax liability that the debtor seeks to discharge in this adversary proceeding stems from her failure to report all of her income in 2004, 2005, 2006, and 2007.

The debtor's under-reported income originated from two distinct sources, discussed in more detail below: funds that she transferred from the helicopter companies to herself after she gained control of the companies and royalties that she received from selling her frozen appetizer recipe. Two of the helicopter companies were based in Tulsa, Oklahoma. The first, Allied Helicopter International, Inc. [AHI or Allied International], sold helicopter parts and operated an agricultural spraying business. The second, Allied Helicopter Service [AHS or Allied Service], built helicopters and housed an aviation school. The third company, Helicopteros Aliados de Panama [HADP or Helicopteros], was a Panamanian corporation that held cash and securities but had no day to day operations. The debtor's father had an acrimonious history with the IRS arising from a long dispute regarding Helicopteros's taxes in the late 1960s or early 1970s. The debtor

testified that her father ultimately prevailed against the IRS and that her father told her that "it was decided the taxes had already been paid on the Helicopteros Aliados de Panama money and we go forward from then."[1] (Trial Tr. vol II, 8, Oct. 27, 2015.) However, the debtor believes that the stress inflicted upon her family by the IRS during Helicopteros's tax dispute was one of the primary causes of her mother's suicide in 1972. The debtor, who was 22 years old when her mother died, openly blames the IRS for her mother's death. After her mother's suicide, the debtor's father–whom the debtor characterizes as a "genius businessman"–began putting assets in the debtor's name, including a parcel of real property located in Osage County, Oklahoma [the Osage property]. Although the debtor's father deeded the Osage property to her in 1974, the deed was not recorded at the time of the transfer. The debtor's father also established the debtor as the only shareholder–other than himself–in his three helicopter companies.

In 1985, the debtor retained a certified public accountant, Kim O'Dell [O'Dell], to handle the debtor's catering business's taxes. O'Dell continued to handle the debtor's taxes–business and personal–until 2009. In 1994, the debtor established AICDI, Inc. [AICDI].[2] The debtor was the sole shareholder of AICDI, forming the corporation to purchase commercial property located at 3290 N. Lee Avenue in Fayetteville, Arkansas [Lee Avenue property]. Subsequently, the debtor used the Lee Avenue property as the site of her various food-based enterprises. In 2003, the principals of a brokerage firm, Food Talk, approached the debtor with an idea to create frozen gourmet appetizers for Sam's Club. The debtor formed a limited liability company, Café Nibbles, LLC [Café Nibbles], for the purpose of creating and selling the frozen appetizers. In 2004, the

---

[1] The debtor's father wrote a letter to the debtor in 1990 advising her how to handle Helicopteros's taxes upon his death if there was a problem with the IRS. With the letter, he included a law review article, a trust agreement, and legal notes. The debtor testified that she does not understand "a lot of" the documentation that her father sent to her on this issue, but the documents were the basis for her belief "there was no tax ever to be paid on the assets . . . from [her] father and/or the trust." (Trial Tr. vol II, 9-10.)

[2] The debtor testified that AICDI stands for "Any Idiot Can Do It."

debtor, through Café Nibbles, sold a mushroom appetizer recipe to a third party for nationwide distribution through Sam's Club [the mushroom business]. In 2004, 2005, and 2006, Café Nibbles received royalty checks totaling $656,568.02 as a result of the mushroom business. The debtor reported $295,544.58 in royalty income from the mushroom business on her tax returns, explaining at trial that from the total royalties paid to Café Nibbles, she paid 30% to Food Talk as a commission and transferred 25% to her husband's trust.[3]

In 2001, the debtor's father's health began to decline and she gained control of the three helicopter companies through a power of attorney. In 2003, the debtor's father suffered a stroke. That same year, the debtor moved $3,000,000.00 in securities out of Helicopteros's account and into her personal brokerage account, testifying that she did so after consulting a financial advisor and an attorney.[4] (Trial Tr. vol I, 143, Oct. 26, 2015.) In 2004, the debtor hired O'Dell to handle the taxes for the three helicopter companies. Throughout 2004, the debtor transferred funds from each of the three helicopter companies to her personal accounts and recorded the transfers on the respective corporate books as loans. The debtor's father passed away in 2005, resulting in the debtor becoming the sole shareholder of the three helicopter companies. After her father's death, the debtor continued to transfer funds from each of the three helicopter companies

---

[3] At trial, the debtor introduced a document purporting to be a contract executed on January 7, 2004, between Café Nibbles and her husband at the time, James Hatfield [Hatfield]. The document provided that in exchange for 25% of the royalties paid to Café Nibbles, Hatfield would provide "all business administrative, marketing, and consulting services for Nibbles, as directed by the Nibbles manager." (Pl. Ex. 30.) The debtor testified that she made the checks payable to the James Hatfield Trust rather than to Hatfield at his request.

[4] The debtor retained multiple attorneys during the course of her financial difficulties: Lee Moore advised the debtor regarding the transfer from Helicopteros to the debtor in 2003, and–as discussed below–Denton Woods handled her appeal with the IRS; Richard Osborne assisted her with business transactions; and Jill Jacoway represented her in her bankruptcy case and this adversary proceeding.

to herself and continued to characterize the transfers as loans on the corporate books.[5] The debtor admits that she never repaid any of the "loans"–even in part–and, at trial, could not say for certain whether she had planned to do so. (Trial Tr. vol I, 250.) According to the debtor, O'Dell drafted promissory notes for the debtor to sign to memorialize some–but not all–of the purported loans. Additionally, although the debtor received a promissory note from O'Dell to memorialize a "loan" from Helicopteros dated January 5, 2005, the debtor failed to sign the note. Ultimately, the debtor transferred by check and wire transfer a total of $2,762,810.00 from the three companies to herself during 2004, 2005, 2006, and 2007.[6] The debtor did not disclose her receipt of the transferred funds on her tax returns for those years.

---

[5] The debtor's testimony regarding O'Dell's role in characterizing the transfers as loans was inconsistent:
- Q: Why did you write loans?
- A: I would ask my accountant how to do this, and she said if you're taking money out of these accounts, then put loan – or repayment or loan, and she said she would deal with them when – when she got the checks and – do whatever accounting was necessary on them.
- Q: Did you rely on her advice?
- A: Completely.

(Trial Tr. vol II, 53-54.)

- Q. Is it your testimony that it was Kim O'Dell's idea for you to sign this note and call this money that . . . Helicopteros was giving you loans?
- A. I don't know that. I – I know that she did not know how – exactly to handle the HADP.
- Q. You were taking money out of HADP in 2004, weren't you?
- A. Yes, sir, it was mine.
- Q. You were writing checks. And on the checks, in 2004, you were writing in the memo, "loan," weren't you?
- A. If that is what she told me to do, yes.

(Trial Tr. vol I, 203-04.)

[6] Of the $2,762,810.00, the debtor transferred $575,659.00 from Allied International, $696,107.00 from Allied Services, and $1,491,044.00 from Helicopteros.

On October 1, 2007, IRS agent Beverly Clark sent a letter to the debtor notifying her that her 2004 Form 1040 was under examination in relation to the IRS's examination of Allied International and that the IRS would consider whether Allied International had paid the debtor constructive dividends in 2004. (IRS Ex. 112.) The October 1, 2007 letter also notified the debtor that the copy of the debtor's personal return for 2005 that O'Dell had provided to the IRS had not been filed. As a result, the IRS was treating the 2005 return as delinquent and placing it under examination. The letter warned the debtor that her 2006 return would be delinquent if not filed by October 15, 2007. The debtor testified that she "probably" read "part of" the October 1, 2007 letter before delivering it to O'Dell, whom the debtor says that she trusted to take care of it. (Trial Tr. vol I, 147.) The debtor testified that she did not believe that she owed any additional taxes when she received the October 1, 2007 letter and that she was unconcerned about the audit. By the end of 2007, the debtor had liquidated the remainder of Helicopteros's cash and securities and had likewise disposed of Allied International's and Allied Service's assets.[7] (Trial Tr. vol I, 145.)

---

[7] By any standard, the debtor–who testified that she had previously lived modestly–indulged in a more extravagant lifestyle after gaining control of the helicopter companies in 2001. In 2004, she bought a home for $460,000.00 then spent over $1,000,000.00 renovating it. In 2005, she bought a bronze razorback sculpture in Italy for $75,000.00 that she donated to the University of Arkansas. In 2006, she donated $60,000.00 to be used as a golf endowment at the University of Arkansas. She continued to live lavishly from 2007 to 2010. During this period, the debtor had four vehicles–a Hummer, a Maserati, a Cadillac Escalade, and a Cadillac XLR. She traveled extensively, routinely spending tens of thousands of dollars per month–once spending $91,000.00 in a single month–on trips to exotic locales including Russia, Vietnam, Africa, Antarctica, the Caribbean, and Argentina. The debtor also donated money generously, giving $50,000.00 to a public library and donating $10,000.00 for a "Fighting Razorback" in 2008 and $10,000.00 to a private elementary school in 2009. In addition, she donated to political campaigns, freely loaned money to friends and acquaintances, gifted money to members of her family, and regularly threw large, expensive parties.

On February 25, 2008, the IRS sent the debtor a Notice of Intent to Levy with respect to the 2005 taxes. On March 24, 2008, IRS agent Virginia LeFay[8] sent a "smoke out" letter to O'Dell stating that the IRS had not received the information promised by O'Dell on February 20, 2008, in relation to the debtor's 2004, 2005, and 2006 returns. The smoke out letter urged O'Dell to schedule a face to face meeting with LeFay by April 2, 2008, to allow O'Dell the opportunity to provide the rest of the information without the delay of mailing the documents. The letter advised O'Dell that if she failed to contact LeFay by April 2, the IRS would have no choice but to render a decision based upon the limited information in the file. The March 24 letter included a Summary of Adjustments reflecting that if the IRS made a decision without further information from O'Dell, the debtor would owe $1,212,100.00 in back taxes, penalties, and interest.[9] On March 26, 2008, the debtor received a copy of LeFay's March 24 correspondence by certified mail. The debtor admitted that certified mail signifies important correspondence and further admitted that she signed for the letter, but testified that she does not recall reading the letter when she received it. (Trial Tr. vol I, 151) Instead, she testified that she took the letter to O'Dell without opening it.

In May 2008, the debtor sold stock to fund the purchase of a $355,000.00 condominium in Virginia for her daughter, Lauren Stephens [Lauren]. The debtor testified that she bought the condo for Lauren because she believed that Lauren would be attending the University of Virginia School of Law and she wanted her daughter to have a safe place to live near campus.[10] The debtor believes that a parent has a duty to support a child

---

[8] IRS agent Beverly Clark retired in February 2008, resulting in the transfer of the debtor's case to LeFay on February 26, 2008.

[9] This figure was subsequently reduced in a revised report.

[10] The IRS deposed Lauren on August 1, 2014. Lauren testified during her deposition that she graduated from the University of Virginia law school and was a partner in a law firm in Washington, D.C. Subsequent to Lauren's deposition, the debtor's attorney attempted to verify Lauren's matriculation from the University of Virginia and her employment at the firm that she named in her deposition. Neither

financially "forever." (Trial Tr. vol II, 17.) During the summer of 2008, the debtor listed her home with a real estate agent, attempting to sell it for $1,900,000.00. At trial, she testified that she tried to sell her home in 2008 because she and Hatfield were divorcing–contradicting her August 20, 2014 deposition testimony that she tried to sell the home because O'Dell had started "scaring her" about her tax liability. (Trial Tr. vol II, 137.) On December 29, 2008, the IRS sent the debtor an official audit report proposing additional tax liability for the debtor–including penalties and interest as of that date–in the amount of $701,244.95. The increased tax liability was premised upon the IRS's discovery of the unreported royalties from the mushroom business that were transferred to Food Talk and Hatfield's trust and a determination that the loans from the three helicopter companies to the debtor were actually constructive dividends.[11] At trial, the debtor testified that she understood what dividends were and "absolutely" understood that dividends had to be reported to the IRS as taxable income. (Trial Tr. vol I, 146.) At the end of 2008, the debtor had over $2,000,000.00 in assets. (Trial Tr. vol II, 63.) The debtor testified that she took the report to O'Dell. O'Dell looked at the letter and then threw it at the debtor and told her that she needed a tax attorney. The debtor retained the law firm of Reece Moore Pendergraft LLP to handle her appeal of the audit, working primarily with Denton Woods. Despite O'Dell's apparently cavalier response to the outcome of the audit, the debtor gave or loaned O'Dell $10,000.00 in cash in January 2009. On January 21, 2009, the IRS sent a copy of the audit results to Woods, establishing a deadline of February 20, 2009, for the debtor to agree with the proposed changes in writing or take steps to begin the appeal process. (IRS Ex. 108.)

---

institution had a record of Lauren's past or present affiliation. At the time of the trial, the debtor believed that Lauren had never attended law school.

[11] "A constructive dividend is a payment or economic benefit conferred by a corporation on one of its shareholders." *DKD Enter. v. Comm'r*, 685 F.3d 730, 735 (8th Cir. 2012) (citations omitted). Constructive dividends are taxable to the benefitted shareholder. *Comm'r v. Riss*, 374 F.2d 161, 167 (8th Cir. 1967).

On January 23, 2009, the debtor sold the Osage property for $385,000.00. She took the proceeds from the sale of the Osage property to a bank and purchased 32 cashier's checks in the amount of $9999.00 each. The debtor testified that she procured the cashier's checks for that amount because Hatfield, her husband at the time, told her to do so. She testified that she did not question her husband's advice and that purchasing 32 cashier's checks for $9999.00 each "didn't matter to [her] one way or the other" and "looked fine to [her]." (Trial Tr. vol II, 125.) On February 18, 2009, Woods sent a protest letter to the IRS in response to the January 21 audit report, initiating the appeal process. Ostensibly based upon the information in the protest letter, LeFay revised her report on February 24, 2009, to reflect that the debtor had understated her income by $1,095,229.00 in 2004; $989,066.00 in 2005; and $446,529.00 in 2006–a total understatement of $2,530,824.00, resulting in additional tax liability, penalties, and interest in the amount of $599,124.27. After the IRS applied a credit of $42,244.00 for the debtor's overpayment of her 2007 taxes, the total amount due from the debtor to the IRS pursuant to the revised report was $556,880.27. (IRS Ex. 106.)

From 2009 to 2012, the debtor transferred to Lauren and Lauren's creditors a total of $70,761.00–transferring more than half that amount–$37,962.00–in 2012 alone. On June 1, 2012, the IRS notified the debtor that her appeal had been denied and had resulted in the IRS finding that the debtor owed $791,261.60 in tax liability–more than the December 29, 2008 audit report had indicated. On June 7, 2012, the debtor made an offer to the State of Arkansas to settle her state tax debt for $12,000.00. (IRS Ex. 159.) As part of her offer to the State, the debtor was required to provide a list of her assets. The debtor failed to list her AICDI shares in the offer submitted to the State–despite the value of the debtor's interest in AICDI being approximately $100,000.00.[12] She also failed to list mineral rights that she inherited from her father and had sold for $60,000.00

---

[12] The Lee Avenue property owned by AICDI was appraised for $325,000.00 in 2009 and AICDI's only debt was secured by a mortgage of approximately $230,000.00 held by First State Bank.

on June 13, 2012–less than two weeks after the offer was submitted to the State. The debtor further failed to disclose that she was owed $200,000.00 from an outstanding loan made to her cousin in 2006. Instead, the debtor's offer to the State of Arkansas stated that she had less than $10,000.00 in assets. The same date that the debtor received the $60,000.00 payment from selling the mineral rights, she loaned Lauren $24,000.00 to purchase a garage near her condominium in Virginia because Lauren was "bugging" her about it. At the debtor's request, Lauren drafted a loan agreement for $24,000.00 and sent it to the debtor. The debtor first testified that she loaned Lauren the money on June 13, 2012, then later testified that she had "probably" loaned her the money before that date, in April or May, and had received the loan agreement from Lauren on June 13, 2012.[13] When asked why, if she had loaned Lauren the money in April or May, she had not listed the $24,000.00 debt that Lauren owed to her as an asset on her offer of compromise to the State of Arkansas, the debtor replied "I don't know why I did not do it. It was certainly not to avoid anything. Besides, I would never see that money again." (Trial Tr. vol II, 173.)

On August 22, 2012, the debtor assigned her shares of AICDI to Lauren after Richard Osborne, her transactional attorney, suggested it. The debtor testified that, at the time of the assignment, she believed that Lauren was an attorney in Washington, D.C. and was also in the process of settling a personal injury case with General Motors–though both of these beliefs, she says, turned out to be wrong. The debtor stated at trial that she believed that Lauren was in favor of the assignment to help the debtor keep AICDI operational, and that she likewise believed that Lauren would assume the mortgage obligation at First State Bank. (Trial Tr. vol II, 91-92.) Osborne testified that he drafted the assignment of the AICDI shares from the debtor to Lauren because he believed that Lauren was financially able to help her mother and that the shares could not remain in the debtor's

---

[13] The loan agreement is dated June 13, 2012. It was signed by Lauren on June 16, 2012, and was signed by the debtor on June 15, 2012, although the debtor's signature appears to have been added to the agreement by Lauren.

name due to the fact that she "had creditors coming after her." (Trial Tr. vol II, 294.)

The assignment provided that

> For the sum of Two Hundred Forty Thousand dollars ($240,000.00), and other good and valuable consideration, the receipt and acknowledgment of which are hereby acknowledged, I, Carolyn S. Stephens hereby assign unto Lauren Elizabeth David[14] all of my shares in AICDI, Inc., an Arkansas corporation. I further warrant and guarantee that this assignment is for One Hundred Percent (100%) of all outstanding stock of said corporation.
>
> This assignment is subject to a promissory note owed by said corporation to First State Bank in the amount of Two Hundred Twenty-nine Thousand One Hundred Ninety-one and 04/00 Dollars ($229,191.04) as of this date, plus accrued interest [approximately Nine Hundred Three Dollars and 64/00 ($903.64)].

(IRS Ex. 115.)

Lauren was to pay the debtor the remaining $9905.32 in cash. (IRS Ex. 145.) Osborne also drafted a power of attorney that granted the debtor the authority to control AICDI as she had prior to the transfer, as well as a corporate resolution that allowed both the debtor and Lauren to access AICDI's bank account and make financial decisions for AICDI.[15] Although Lauren repeatedly accessed AICDI's bank account to pay her personal expenses, she never made arrangements with First State Bank to assume AICDI's mortgage obligation, an obligation that was current at the time of the assignment; nor did Lauren pay the $9905.32 due to the debtor under the assignment. Although Lauren had not performed any of her obligations under the assignment, AICDI remained in Lauren's name for over two years. It was not until December 2014, after the debtor had filed bankruptcy, that Lauren transferred the condo in Virginia and the AICDI shares back to

---

[14] The debtor's attorney drafted the assignment to reflect that the debtor was assigning her shares of AICDI to Lauren Elizabeth David, not Lauren Stephens. The debtor testified that "David" is the debtor's maiden name, and that she believes–but does not know–that her daughter's last name is actually Stephens.

[15] The debtor admitted at trial that she signed Lauren's name to the corporate resolution.

11

the debtor. (Pl. Ex. 11.) On February 13, 2015, the chapter 7 trustee in the debtor's bankruptcy case demanded turnover of the AICDI stock. The trustee subsequently sold the Lee Avenue property for $269,000.00.

**Summary of Parties' Arguments**

The IRS contends that the debtor's tax liability is nondischargeable because: (1) she filed fraudulent returns that understated her income for 2004, 2005, 2006, and 2007, and (2) she willfully attempted to evade the payment of her taxes by buying the Virginia condominium in Lauren's name two months after receiving the smoke out letter from the IRS, obtaining 32 separate cashier's checks in the amount of $9999.00 each after selling the Osage property subsequent to the issuance of the audit report, transferring thousands of dollars to Lauren and others during the audit and appeal, and assigning her AICDI shares to Lauren for no consideration two months after learning that her appeal had been denied. The debtor argues that the taxes should be discharged because she relied on O'Dell to prepare her tax returns accurately, she was not aware that she would likely owe taxes while she possessed the means to pay them, she bought the condominium for Lauren because she believes that parents should support their children financially forever, she obtained the 32 cashier's checks upon her then-husband's advice, and she did not assign the AICDI shares to Lauren to escape paying taxes but did so because she believed that Lauren had the money and desire to help AICDI financially.

**Law and Analysis**

Generally, "calculating which tax debts are dischargeable is a relatively simple process." *Waugh v. Internal Revenue Serv.* (*In re Waugh*), 109 F.3d 489, 491 (8th Cir. 1997). Section 523(a)(1)(A), by reference to § 507(a)(8)(A), provides that income taxes for which returns were due more than three years prior to the date of the filing of the bankruptcy petition are dischargeable if the taxes were not assessed within 240 days of the date of the filing of the petition. In the instant case, the parties stipulated at trial that the debtor's tax returns for 2004, 2005, 2006, and 2007 were due more than three years prior to the date that the debtor filed bankruptcy on July 18, 2013. The parties further

stipulated that the taxes were assessed 267 days prior to the date that the debtor filed her petition–timing that the IRS deemed suspect at trial but nevertheless remains outside the 240-day look-back period required by § 507(a)(8)(A)(ii) for dischargeability.  Based upon these stipulations, the Court finds that the taxes fall within the parameters of dischargeability.  However, "[s]ection 523(a)(1)(C) creates two exceptions to discharge–when a debtor files a fraudulent return and when a debtor 'willfully attempt[s] in any manner to evade or defeat [a] tax.'" *United States v. Coney*, 689 F.3d 365, 371 (5th Cir. 2012).  In this case, the IRS contends that the debtor filed fraudulent returns when she understated her income to the IRS on the returns for the relevant years *and* that once her additional tax liability was discovered by the IRS, she willfully attempted to evade payment.  For the IRS to prevail on a determination of nondischargeability, it must prove one of the two grounds stated in § 523(a)(1)(C) by a preponderance of the evidence.  *See  May v. Missouri Dep't. of Revenue et al*. (*In re May*), 251 B.R. 714, 717 (B.A.P. 8th Cir. 2000) (government bears the burden of proof); *see also Vaughn v. Internal Revenue Serv.* (*In re Vaughn*), 765 F.3d 1174, 1179 (10th Cir. 2014) (section 523(a)(1)(C) provides two independent grounds for the nondischargeability of tax liability).

The Court will first address the IRS's allegation that the debtor willfully attempted to evade or defeat her tax liability before turning to the question of whether she filed fraudulent returns.  For the Court to find nondischargeability under the second part of § 523(a)(1)(C), which is premised upon a willful attempt to evade or defeat tax liability, the IRS must show that the debtor (1) was aware of her duty to pay the taxes, (2) had the resources to pay the taxes, and (3) took steps to avoid paying the taxes.  *In re May,* 251 B.R. at 718.  "[T]here is a conduct element as well as an intent element to the statute." *Id.* (citing *Matter of Birkenstock*, 87 F.3d 947 (7th Cir. 1996)).

> Factors which indicate an intent to evade tax obligations include understatements of income, failure to file tax returns, implausible or inconsistent behavior by the taxpayer, the failure to cooperate with the tax authorities, concealment of assets, dealing in cash, shielding income and otherwise frustrating collection efforts.  *Teeslink v. United States* (*In re*

> *Teeslink*), 165 B.R. 708, 716 (Bankr. S.D. Ga. 1994).  A finding under section 523(a)(1)(C) may encompass various schemes, including concealment by which tax evasion may be accomplished.  Conduct aimed at concealing income and assets constitutes a willful attempt to evade or defeat taxes.  *Bruner v. United States* (*In re Bruner*), 55 F.3d 195 (5th Cir. 1995).

*Id*.

The Court finds that the IRS proved that the debtor was aware of her duty to pay taxes, meeting the first requirement for finding of nondischargeability under the second part of § 523(a)(1)(C).  The IRS notified the debtor that she was being audited on October 1, 2007, in a letter specifically stating that the IRS was considering whether to treat payments made in 2004 from Allied International to the debtor as constructive dividends.  The debtor knew that she had made numerous transfers from all three helicopter companies to her personal accounts in 2004, 2005, 2006, and 2007, and the transfers were structured similarly to the 2004 Allied International transaction that was under scrutiny by the IRS.  Although the debtor claimed to implicitly trust O'Dell's classification of the transfers as loans on her tax returns, she contradicted that testimony by also admitting that she knew that O'Dell was unsure how to treat the transfers on the debtor's tax returns.  The debtor admitted that she never repaid any part of the "loans" from the companies and further testified that she does not know if she had even planned to do so.  When these admissions are viewed in the light of the debtor's testimony that she "absolutely" knew what dividends were and that they had to be reported to the IRS as income, the fact that the IRS was beginning to question the nature of some of these purported loans should have, at a minimum, put the debtor on notice that she and O'Dell may have significantly under-reported her income during the years that she transferred the funds from the helicopter companies to herself and, as a result, she could owe additional taxes for those years.  Additionally, on March 26, 2008, the debtor signed for the smoke out letter that the IRS had sent to her by certified mail.  The smoke out letter notified the debtor that the IRS had not received information from O'Dell to complete the audit and, based on the information currently in the IRS's file, the debtor owed $1,212,100.00 in additional taxes.  The debtor testified that she did not read the

letter–despite acknowledging that certified mail signifies important correspondence–but instead claims that she delivered the letter to O'Dell without opening it. The Court does not find the debtor's testimony credible on this point. The debtor read the previous letter from the IRS dated October 1, 2007, at least in part, before delivering it to O'Dell. When the March 24 letter arrived from the IRS by certified mail, the debtor knew that an investigation was underway and would have, ostensibly, been interested in its progress. Further, if the debtor was–as she testified–unconcerned about the audit because she believed that she had paid all taxes owed, then she would have read the March 24 letter expecting it to contain information confirming her belief that she was in good standing with the IRS–rather than delivering it to her accountant for handling without giving the contents so much as a cursory glance. Even if the Court assumes for a moment that the debtor testified truthfully that she did not open the March 24 letter, the Court finds that her knowledge of the contents of the letter "may be inferred from deliberate acts amounting to willful blindness to the existence of fact or acts constituting conscious purpose to avoid enlightenment." *Mattingly v. United States*, 924 F.2d 785, 792 (8th Cir. 1991) (citation omitted).

Additionally, according the debtor's deposition testimony, O'Dell had instilled in her enough fear of potential tax liability by the summer of 2008 that it lead the debtor to attempt to sell her home, listing it for $1,900,000.00. In the unlikely circumstance that there remained any lingering uncertainty in the debtor's mind that she was likely to owe a significant tax debt to the IRS after mid-2008, it was extinguished on December 29, 2008, when the IRS sent the debtor its official audit report notifying her that the audit had resulted in the IRS finding that she owed taxes in the amount of $701,244.95. When the debtor delivered the December 29, 2008 audit report to O'Dell, O'Dell threw it at the debtor and told her that she needed a tax attorney. Even if the debtor had blindly relied on O'Dell prior to that moment, O'Dell's reaction to the audit report put the debtor on notice that the situation was serious and that she was likely to owe a significant tax

debt.[16]  At the end of 2008, the debtor still had over $2,000,000.00 in assets and could have paid the taxes owed in their entirety.  Therefore, the Court also finds that the IRS proved that the debtor had the resources to pay her taxes, satisfying the second element required for a finding of nondischargeability under this subsection.

Finally, the Court finds that the IRS proved the third element required under this subsection–that the debtor took steps to avoid paying her taxes.  As discussed above, the Court finds that the debtor was aware that there was the potential for her to owe over $1,000,000.00 in taxes by March 26, 2008, when she received LeFay's March 24 letter.  Only two months later, the debtor used funds in her brokerage account to buy a $355,000.00 condominium in Virginia for Lauren.  By the end of 2008, the debtor had disposed of all but $25,564.33 of the funds remaining in her brokerage account.  As the audit and appeal proceeded and the debtor was regularly notified through the IRS's correspondence of the likelihood of an unfavorable outcome, she continued to dispose of and attempt to conceal her assets.  On January 23, 2009, less than one month after the debtor received the audit report on December 29, 2008, the debtor sold the Osage property and obtained 32 cashier's checks in the amount of $9999.00 each.  This is significant because it appears that the debtor purchased the checks in that amount in an attempt to circumvent the reporting requirements of the Bank Secrecy Act, which requires "financial institutions to send a report to the IRS when a depositor withdraws more than $10,000 in currency during one business day."  *United States v. Coney*, 689 F.3d at 375.  For purposes of § 523(a)(1)(C), a debtor's effort to avoid the currency transaction reporting requirements may constitute an attempt to evade or defeat the payment of a tax.  *Id.*  In this case, the debtor's act of obtaining multiple $9999.00

---

[16] Although taxes had not yet been assessed in December 2008, assessment "is not required in order for a debtor's conduct to be considered willful.  In *Dalton*, we held that the actions of a debtor–including the purchase of a condominium and the transfer of funds to his fiancée–taken when he 'knew of [a] tax investigation which was likely to result in a significant assessment,' but prior to an actual tax assessment, were willful for purposes of § 523(a)(1)(C)."  *In re Vaughn*, 765 F.3d at 1182 (quoting *Dalton v. Internal Revenue Serv.* (*In re Dalton*), 77 F.3d 1297, 1303 (10th Cir. 1996)).

cashier's checks on the heels of receiving the audit report and selling the Osage property leads this Court to the inescapable conclusion that the debtor was attempting to evade or defeat the payment of her tax liability. It is worth noting that the debtor does not claim that she relied on professional advice in this instance; instead, she claims that she obtained the cashier's checks because her husband told her to do so and she saw nothing wrong with it.

On June 13, 2012, less than two weeks after the IRS notified the debtor on June 1, 2012, that her appeal had been denied and that she owed $791,261.60 in taxes, penalties, and interest, the debtor received $60,000.00 from the sale of mineral rights and immediately transferred $24,000.00 to Lauren.[17] Two months later, on August 22, 2012, the debtor transferred her shares of AICDI to Lauren because, according to the debtor, she believed that Lauren was willing and able to assume the $230,000.00 mortgage, as well as pay her the $10,000.00 due under the assignment, thereby infusing AICDI with the funds to continue operating. The Court does not find the debtor's testimony on this point to be credible. The debtor had given or loaned Lauren over $37,000.00 in the eight months leading up to her assignment of the AICDI shares to Lauren and had supported Lauren financially–according to the debtor's own testimony–for her entire life. The Court finds it implausible that the debtor reached a sudden conclusion in August 2012 that Lauren was capable not only of financial independence but of assisting AICDI financially, particularly when Lauren had not repaid any of the previous funds that she had borrowed from the debtor. Finally, Osborne, the attorney that drafted the AICDI assignment,

---

[17] Although the debtor equivocated at trial regarding the date of the loan, there is no evidence before the Court, other than a portion of the debtor's testimony, that the loan was made earlier than June 13, 2012. In fact, the debtor testified that she loaned Lauren the $24,000.00 on the same date that she received payment from the sale of the mineral rights. The debtor's statement of financial affairs indicates that she sold the mineral rights in "summer 2012." The Court takes judicial notice of the fact that summer begins in the month of June. Therefore, the weight of the evidence–including the date on the promissory note itself–supports the Court's finding that the debtor loaned Lauren the $24,000.00 on June 13, 2012.

testified that the debtor assigned her shares to Lauren because creditors were coming after the debtor, making it impossible for her to keep AICDI in her name. The IRS had already denied the debtor's appeal when she assigned her AICDI shares to Lauren, making the IRS, indisputably, one of the debtor's creditors at the time of the assignment. Therefore, the Court finds that the debtor transferred AICDI to Lauren, at least in part, to evade or defeat her taxes.

**Conclusion**

For all of the above stated reasons, the Court finds that the debtor was aware of her duty to pay the taxes, had the resources to pay the taxes, and took steps to avoid paying the taxes. Therefore, the Court finds that the debtor willfully attempted to evade or defeat her taxes. As a result, the Court finds that the debtor's tax liability arising from the underpayment of her taxes in the years 2004, 2005, 2006, and 2007 is nondischargeable under the second part of § 523(a)(1)(C). Based on this finding, the Court need not reach the issue of whether the debtor also filed fraudulent tax returns under the first part of § 523(a)(1)(C). A separate judgment will be entered in favor of the IRS.

IT IS SO ORDERED.

                                                Ben Barry
                                                United States Bankruptcy Judge
                                                Dated:  02/26/2016

cc:    Jill R. Jacoway, attorney for debtor
       Curtis J. Weidler, attorney for IRS
       William M. Clark, Jr., chapter 7 trustee